STATE OF WISCONSIN      CIRCUIT COURT      WINNEBAGO COUNTY

BIG DADDY GAMES, LLC
1223 APPLETON ROAD
MENASHA, WI 54952,

     Plaintiff,

vs.

LEJA DISTRIBUTING, INC.
3048 CTY EE
ABRAMS, WI 54101,

     Defendant.

13CV1383 BR4

Case No. 13-CV-_____
Code No. 30301

WINNEBAGO COUNTY
CLERK OF COURTS

NOV 1 5 2013

CIVIL/FAMILY DIVISION

## SUMMONS

THE STATE OF WISCONSIN, to the above named defendant:

You are hereby notified that the plaintiff named above has filed a lawsuit or other legal action against you. The complaint, which is attached, states the nature and basis of the legal action.

Within forty five (45) days of receiving this summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the complaint. The court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the Court, whose address is Winnebago County Courthouse, 415 Jackson St, Oshkosh, WI 54901 **AND** to NASH, SPINDLER, GRIMSTAD & McCRACKEN, LLP, plaintiff's attorneys, whose address is 1425 Memorial Drive, Manitowoc, Wisconsin 54220. You may have an attorney help or represent you. If you do not provide a proper answer within forty five (45) days, the court may grant judgment against you for the award of money or other

**EXHIBIT**

**A**

legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 3rd day of November, 2013.

NASH, SPINDLER, GRIMSTAD & McCRACKEN LLP

By: Ryan R. Graff
State Bar No. 1051307
John F. Mayer
State Bar No. 1017384
Attorneys for Plaintiff Big Daddy Games, LLC

**Mailing Address:**
1425 Memorial Drive
Manitowoc, WI 54220
920-684-3321 Phone
920-684-0544 Fax
RGraff@nashlaw.com
JMayer@nashlaw.com

2

| STATE OF WISCONSIN | CIRCUIT COURT | WINNEBAGO COUNTY |

BIG DADDY GAMES, LLC
1223 APPLETON ROAD
MENASHA, WI 54952,



Case No. 13-CV-_____
Code No. 30301

     Plaintiff,

vs.

LEJA DISTRIBUTING, INC.
3048 CTY EE
ABRAMS, WI 54101,



     Defendant.

---

## COMPLAINT

---

NOW COMES plaintiff Big Daddy Games, LLC by its attorneys, Nash, Spindler, Grimstad & McCracken, LLP, and alleges the following:

1.    Plaintiff Big Daddy Games, LLC is a Wisconsin Limited Liability Company, with a principal business address at 1223 Appleton Road, Menasha, Wisconsin 54952 and is licensed to do business in the State of Wisconsin.

2.    Defendant Leja Distributing, Inc. is a Wisconsin corporation with a principal business address at 3048 Cty EE, Abrams, Wisconsin 54101, and is licensed to do business in the State of Wisconsin.

### Jurisdiction and Venue

3.    Venue is appropriate in Winnebago County under Wis. Stat. § 801.50(2)(d). Venue is convenient in Winnebago County because the plaintiff resides in Winnebago County.

4.     Jurisdiction is appropriate in Wisconsin because the defendant engaged in "substantial and not isolated activities within the State of Wisconsin." In addition, the dispute arose out of services, goods and activities performed in the State of Wisconsin by Big Daddy Games, LLC and/or Leja Distributing, Inc. allowing Wisconsin courts to exercise jurisdiction over the dispute. Finally, the defendant has "purposely availed itself of the privileges of conducting activities within the State of Wisconsin" and a Wisconsin court exercising jurisdiction over the defendant would comport with "traditional notions of fair play" and "substantial justice" because the defendant has the required "minimum contracts" with Wisconsin.

## General Allegations

5.     This is an action for copyright infringement under the United States Copyright Act (17 U.S.C. § 501) and trademark infringement under the United States Lanham Act § 43A (15 U.S.C. § 1125(a)).

6.     Big Daddy Games, LLC ("Big Daddy") seeks, among other things, damages stemming from defendant's infringement of Big Daddy's copyrights and trademarks associated with the video amusement games titled Spooky Spins, Egyptian Treasure and Reef Reels ("The Games").

7.     Big Daddy develops game software and sells and distributes The Games to customers in Wisconsin and elsewhere throughout the United States.

8.     John Paul Jones, an Australian citizen, solely authored The Games in Australia. Specifically, Mr. Jones authored Egyptian Treasure in or about 2002, Reef Reels between approximately July and November of 2004 and Spooky Spins approximately between July and November of 2004.

2

9.    Fat Man Games International, LLC ("Fat Man Games") purchased from John Paul Jones all rights, title interest in and to the copyrights in The Games and any trademark rights to The Games in or about late 2004. Mr. Jones signed an Intellectual Property Confirmation Agreement, attached hereto as Exhibit A, which evidences this sale.

10.    Fat Man Games dissolved on January 5, 2009. Upon Fat Man Games' dissolution, Fat Man Games' assets were distributed. Todd Stimac and Eric Jacobson each owned 50% of Triax Enterprises, LLC ("Triax"). Triax solely owned Fat Man Games. Triax also dissolved on January 5, 2009. Upon the dissolution of Fat Man Games and Triax, Mr. Stimac and Mr. Jacobson both received joint and equal ownership of Fat Man Games' copyrights, trademarks and other intellectual property rights to The Games.

11.    Effective January 6, 2009, Eric Jacobson assigned all of his copyrights and trademark rights to The Games to Big Daddy. Mr. Jacobson's Copyright and Trademark Assignment Agreement is attached hereto as Exhibit B.

12.    Big Daddy co-owns all rights, title and interest to The Games.

13.    Big Daddy possesses a registered United States copyright for Spooky Spins (Registration No. TX 7-384-401). A copy of the copyright registration for Spooky Spin is attached hereto as Exhibit C.

14.    Big Daddy Games possesses a registered United States copyright for Egyptian Treasure (Registration No. TX 7-496-918). A copy of the copyright registration for Egyptian Treasure is attached hereto as Exhibit D.

15.     Big Daddy Games possesses a registered United States copyright for Reef Reels (Registration No. TX 7-496-922). A copy of the copyright registration for Egyptian Treasure is attached hereto as Exhibit E.

16.     From at least 2005 until January 6, 2009, Fat Man Games used the inherently distinct trademark "Spooky Spins" in interstate commerce in connection with the sale and distribution of Spooky Spins games. From January 7, 2009 to the present, Big Daddy has used the inherently distinctive trademark "Spooky Spins" in interstate commerce in connection with the sale and distribution of Spooky Spins games. By virtue of Big Daddy's extensive use of the Spooky Spins trademark in interstate commerce in connection with video amusement games, Big Daddy has acquired an enforceable trademark rights under the Lanham Act (15 U.S.C. § 1125(a)) and substantial goodwill in the Spooky Spins mark. The Spooky Spins mark has acquired an association, or secondary meaning, among relevant consumers as satisfying or suggesting Big Daddy as the source or origin of the Spooky Spins game.

17.     From at least 2005 until January 6, 2009, Fat Man Games used the inherently distinct trademark "Egyptian Treasure" in interstate commerce in connection with the sale and distribution of Egyptian Treasure games. From January 7, 2009 to the present, Big Daddy has used the inherently distinctive trademark "Egyptian Treasure" in interstate commerce in connection with the sale and distribution of Egyptian Treasure games. By virtue of Big Daddy's extensive use of the Egyptian Treasure trademark in interstate commerce in connection with video amusement games, Big Daddy has acquired an enforceable trademark rights under the Lanham Act (15 U.S.C. § 1125(a)) and substantial goodwill in the Egyptian Treasure mark. The Egyptian Treasure mark

4

has acquired an association, or secondary meaning, among relevant consumers as satisfying or suggesting Big Daddy as the source or origin of the Egyptian Treasure game.

18.     From at least 2005 until January 6, 2009, Fat Man Games used the inherently distinct trademark "Reef Reels" in interstate commerce in connection with the sale and distribution of Reef Reels games. From January 7, 2009 to the present, Big Daddy has used the inherently distinctive trademark "Reef Reels" in interstate commerce in connection with the sale and distribution of Reef Reels games. By virtue of Big Daddy's extensive use of the Reef Reels trademark in interstate commerce in connection with video amusement games, Big Daddy has acquired an enforceable trademark rights under the Lanham Act (15 U.S.C. § 1125(a)) and substantial goodwill in the Reef Reels mark. The Reef Reels mark has acquired an association, or secondary meaning, among relevant consumers as satisfying or suggesting Big Daddy as the source or origin of the Reef Reels game.

19.     Big Daddy's copyright to The Games include the software source code for The Games, the arrangement of the graphics in The Games and the design of The Games' layout.

20.     On January 1, 2010, George Simonis trading under Pokies4Fun allegedly entered into a software license agreement with Reel Spin Studios, LLC ("Reel Spin"). The software license agreement granted Reel Spin a 20 year exclusive license to run individual applications of The Games and to rent or lease any game in the software to The Games without the consent of Pokies4Fun.

Case 1:13-cv-01430-WCG   Filed 12/20/13   Page 7 of 71   Document 1-2

21. Upon information and belief, Reel Spin hired Q Games to use the individual application of The Games that Reel Spin obtained through a software license agreement to create games that function, are arranged and look and feel substantially similar to Big Daddy's games.

22. The software license agreement is invalid because George Simonis, any business or partnership training under the name Pokies4Fun, George Simonis trading as Pokies4Fun or any entity of any kind owned or operated in part or in whole by Simonis did not possess the right to license The Games to Reel Spin.

23. Upon information and belief, the software source code, the arrangement of graphics and the layout of the individual application of The Games that George Simonis trading as Pokies4Fun license to Reel Spin was substantially similar to the software source code, the arrangement of graphics and layout of Big Daddy's games.

24. Reel Spin or some other distributer of Reel Spin's games placed infringing games with defendant Leja Distributing, Inc. for use in defendant Leja Distributing, Inc.'s business and defendant Leja Distributing, Inc. has publicly displayed and operated the infringing games.

25. On April 10, 2013, U.S. District Court for the Western District Judge Barbara Crabb ruled that Big Daddy is the co-owner of the copyright for The Games and that Reel Spin had no authority to manufacture, distribute, sell and/or lease The Games protected by that copyright. As a result of Judge Crabb's ruling, Big Daddy's copyright in The Games are incontrovertible and it also leads to the conclusion that defendant Leja Distributing, Inc.'s games featuring The Games infringe on Big Daddy's copyright.

Case 1:13-cv-01430-WCG   Filed 12/20/13   Page 8 of 71   Document 1-2

Judge Crabb's decision is attached as Exhibit F. The relevant portions of Judge Crabb's decision are found on pages 24 to 26.

## Count I – Copyright Infringement 17 U.S.C. § 501, ET SEQ.

Big Daddy realleges and incorporates herein by reference the allegations in the foregoing paragraphs, as if fully stated herein.

26.   The Games are original works of authorship entitled to copyright protection. These original works of authorship include the software source code for The Games, the arrangement of the graphics of The Games and the design of The Game's layout.

27.   As evidenced by the copyright registrations attached as Exhibits C, D and E, Big Daddy co-owns all copyrights to The Games.

28.   Big Daddy has not licensed, assigned, authorized or otherwise given permission to defendant to reproduce, sell, distribute, license, display, operate or otherwise use The Games, or to create or use any derivative works based thereon.

29.   Defendant Leja Distributing, Inc. has infringed on Big Daddy's copyright to The Games at least by publicly displaying, publicly operating and/or publicly distributing the infringing games, which are substantially similar to Big Daddy's games in appearance, operation, function, arrangement, look and feel.

30.   As a direct and proximate result of defendant Leja Distributing, Inc.'s infringement, Big Daddy has been, and continues to be, substantially injured in its business, including suffering irreparable harm to, among other things, the goodwill and reputation of its products and loss of revenues and profits.

7

31.     Upon information and belief, defendant has profited from such infringement in an amount to be determined at trial.

## Count II – Violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a))

Big Daddy realleges and incorporates herein by reference the allegations in the foregoing paragraphs, as if fully stated herein.

32.     Defendant Leja Distributing, Inc. has advertised and/or used the identical names (Spooky Spins, Egyptian Treasure and Reef Reels) as Big Daddy's games.

33.     Defendant's use or advertisement of the infringing games is likely to cause consumer confusion in the marketplace and is likely to cause mistake and/or deceive others to incorrectly believe that the infringing games are made by, sponsored by, approved by or originated with or are affiliated with Big Daddy.

34.     As another direct and proximate result of these acts, Big Daddy has been, and continues to be, substantially injured in its business, including suffering harm to, among other things, the goodwill and reputation of its products, and the loss of revenue and profit.

35.     Big Daddy has suffered monetary damages as a result of the acts of the defendant in an amount to be determined at trial.

## Count III – Violation Of Wis. Stat. § 100.18

Big Daddy realleges and incorporates herein by reference the allegations in the foregoing paragraphs, as if fully stated herein.

36.     Defendant's actions alleged above constitute an advertisement, announcement, statement or representation to the public relating to the purchase of merchandise in Wisconsin containing an untrue, deceptive or misleading representation.

8

37.     The statements and representations made by the defendant regarding the infringing games therefore constitute violations of Wis. Stat. § 100.18.

38.     As a direct and proximate result of defendant's violation of Wis. Stat. § 100.18, Big Daddy has been, and continues to be, substantially injured in its business, including suffering harm to, among other things, the goodwill and reputation of its product and the loss of revenue and profit.

39.     Pursuant to Wis. Stat. § 100.18, Big Daddy is entitled to recover its pecuniary loss, costs and reasonable attorney's fees from the defendant.

## Count IV – Unfair Competition

Big Daddy realleges and incorporates herein by reference the allegations in the foregoing paragraphs, as if fully stated herein.

40.     Defendant's acts as set forth above constitute unfair competition in Wisconsin and/or contribute to unfair competition in Wisconsin.

41.     Defendant's acts as set forth herein have been committed in bad faith with the intent to cause confusion, mistake and/or intent to deceive.

42.     As a direct and proximate result of the defendant's infringement, Big Daddy has been, and continues to be, substantially injured in its business, including suffering harm to, among other things, the goodwill and reputation of its products, and loss of revenue and profit.

WHEREFORE the plaintiff demands relief as follows:

A.     For damages to compensate Big Daddy Games, LLC for the actual loss it has suffered arising out of the above-referenced facts;

B.     For the litigation and investigation costs, including actual attorney fees;

9

C.      For exemplary damages;

D.      For any and all other relief that this Court finds just and equitable.

**PLAINTIFF REQUESTS A TRIAL BY A 12-PERSON JURY**

Dated this __13__ day of November, 2013.

NASH, SPINDLER, GRIMSTAD & McCRACKEN LLP

By:     Ryan R. Graff
        State Bar No. 1051307
        John F. Mayer
        State Bar No. 1017384
        Attorneys for Plaintiff Big Daddy Games, LLC

**Mailing Address:**
1425 Memorial Drive
Manitowoc, WI 54220
920-684-3321 Phone
920-684-0544 Fax
RGraff@nashlaw.com
JMayer@nashlaw.com

10

INTELLECTUAL PROPERTY CONFIRMATION

WHEREAS, John Jones, an Australian citizen, authored/created video slot machine type games named "EGYPTIAN TREASURE", "REEF REELS", and "SPOOKY SPINS" (herein referred to as the "Games") ;

AND WHEREAS, early versions thereof were modified by John Jones under contract with Toccata Gaming International, LLC ("TOCCATA") and/or a predecessor thereof;

AND WHEREAS, a third party has begun to market an unauthorized version of the Games;

NOW THEREFORE, in consideration of sums paid by TOCCATA to John Jones for his work on the Games, John Jones hereby confirms:

1.   He has sold, assigned and transferred all copyright and other intellectual property rights to all versions of the Games created before 2009 to TOCCATA's predecessor in title (Fat Man Games International, LLC) together with the right to sue for past, present and future infringement of such versions, and he has sold, assigned and transferred all copyright and other intellectual property rights to all versions of the Games created after 2008 to TOCCATA together with the right to sue for past, present and future infringement of such versions. This includes without limitation (with respect to the Games) the software (object codes and source codes), screen depictions, all other copyrightable aspects therein and thereto, and trademarks (e.g. "SPOOKY SPINS" and appurtenant goodwill).

2.   John Jones understands that certain rights of Fat Man Games International, LLC to the intellectual property with respect to early versions of the Games now also belong to TOCCATA.

3.   Apart from the transactions referred to in paragraphs 1 and 2 above, and licenses that have been terminated, John Jones confirms that he has not transferred to, or licensed, any other person or entity with respect to any copyright or trademark rights to the Games.

John Jones

_[signature]_



## COPYRIGHT AND TRADEMARK ASSIGNMENT

For payment of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which the undersigned does hereby acknowledge, Eric Jacobson ("Assignor"), an individual whose business address is 1223 Appleton Road, Menasha, Wisconsin 54954, hereby transfers and assigns to Big Daddy Games LLC ("Assignee"), an entity whose business address is 1223 Appleton Road, Menasha, Wisconsin 54954, all of his rights, title and interest, in and to the copyright, trademarks (and all goodwill) associated with the software and video-slot machine games entitled "Egyptian Treasure", "Reef Reels", and "Spooky Spins" (the "Games"). This transfer and assignment includes, without limitation, all of the exclusive rights listed in 17 U.S.C. § 106. Assignor hereby transfers and assigns to Assignee all such rights worldwide, including any copyright renewal rights and any causes of action for infringement of the Games that may have accrued prior to the execution date of this Assignment. This transfer and assignment shall be effective as of January 6, 2009.

Dated:

Eric Jacobson

EXHIBIT
B

Registration Number
TX 7-384-401

Effective date of
registration:
July 14, 2011

Title ─────────────────────────────────────────────
           Title of Work: Spooky Spins

Completion/ Publication ──────────────────────
     Year of Completion: 2004
    Date of 1st Publication: January 31, 2005       Nation of 1st Publication: United States

Author ──────────────────────────────────────────
         **■**      Author: John-Paul Jones
       Author Created: computer program, artwork

     Work made for hire: No
          Citizen of: Australia           Domiciled In: Australia

Copyright claimant ──────────────────────────
    Copyright Claimant: Big Daddy Games, LLC
             1223 Appleton Road, Menasha, WI, 54952, United States

    Transfer Statement: By written agreement
    Copyright Claimant: Toccata Gaming International, LLC
             2414 Industrial Drive, #D, Neenah, WI, 54956, United States

    Transfer Statement: By written agreement

Certification ─────────────────────────────────
         Name: Daniel E. Kattman
          Date: July 14, 2011
  Applicant's Tracking Number: 11720

Page 1 of 1

EXHIBIT
C

Registration #:  TX0007384401
Service Request #:  1-634871941

Reinhart Boerner Van Deuren s.c.
Daniel Kattman
1000 N. Water Street
Milwaukee, WI 53202  United States

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

TX 7-496-918

**Effective date of
registration:**

March 21, 2012

**Title**

Title of Work: Egyptian Treasure

**Completion/Publication**

Year of Completion: 2004

Date of 1st Publication: January 31, 2005          Nation of 1st Publication: United States

**Author**

    ■     Author: John-Paul Jones

Author Created: text, compilation

Citizen of: Australia          Domiciled in: Australia

**Copyright claimant**

Copyright Claimant: Big Daddy Games, LLC

1223 Appleton Road, Menasha, WI, 54952, United States

Transfer Statement: By written agreement

Copyright Claimant: Toccata Gaming International, LLC

2414 Industrial Drive, #D, Neenah, WI, 54956, United States

Transfer Statement: By written agreement

**Limitation of copyright claim**

Material excluded from this claim: artwork

New material included in claim: compilation, computer program

**Rights and Permissions**

Organization Name: Reinhart Boerner Van Deuren s.c.

Name: Daniel Kattman

Email: dkattman@reinhartlaw.com          Telephone: 414-298-8185

Address: 1000 N. Water Street

Suite 1900

Milwaukee, WI 53202 United States

Page 1 of 2



EXHIBIT
D

## Certification

|  | Name: | Daniel E. Kattman |
|--|-------|-------------------|
|  | Date: | March 20, 2012 |
| Applicant's Tracking Number: | 11837 |



# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Maria A. Pallante

Register of Copyrights, United States of America

**Registration Number**
TX 7-496-922

Effective date of registration:
March 21, 2012

## Title

Title of Work: Reef Reels

## Completion/Publication

Year of Completion: 2004

Date of 1st Publication: January 31, 2005          Nation of 1st Publication: United States

## Author

◼          Author: John-Paul Jones

Author Created: compilation, computer program

Work made for hire: No

Citizen of: Australia          Domiciled in: Australia

## Copyright claimant

Copyright Claimant: Big Daddy Games, LLC

1223 Appleton Road, Menasha, WI, 54952, United States

Transfer Statement: By written agreement

Copyright Claimant: Toccata Gaming International, LLC

2414 Industrial Drive, #D, Neenah, WI, 54956, United States

Transfer Statement: By written agreement

## Limitation of copyright claim

Material excluded from this claim: artwork

New material included in claim: compilation, computer program

## Rights and Permissions

EXHIBIT
E

| | | |
|---|---|---|
| **Organization Name:** | Reinhart Boerner Van Deuren s.c. | |
| **Name:** | Daniel Kattman | |
| **Email:** | dkattman@reinhartlaw.com | **Telephone:**   414-298-8185 |
| **Address:** | 1000 N. Water Street | |
| | Suite 1900 | |
| | Milwaukee, WI 53202  United States | |

## Certification

| | |
|---|---|
| **Name:** | Daniel B. Kattman |
| **Date:** | March 20, 2012 |
| **Applicant's Tracking Number:** | 11838 |

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BIG DADDY GAMES, LLC,

                    OPINION AND ORDER

            Plaintiff,

                    12-cv-449-bbc

      v.

REEL SPIN STUDIOS, LLC;
GAME MANAGEMENT CORP.;
JAMES L. DONKER; DAVID E. GROND;
PATRICK YOUNG; WILLIAM STIMAC;
MICHAEL LINDEMAN; RHODY R. MALLICK;
DALE CEBULA; KATHLEEN MALONEY;
MATTHEW BARRETT; ROBERT L. DIENER;
THE LYONS DEN DL, LLC; NIGL'S, INC.;
GAMEDAY SPORTS BAR, INC.;
ANTLERS SPORTS BAR & GRILL, LLC;
OSHKOSH LANES LLC; BACK AGAIN
STADIUM BAR, INC.; MR. D'S TWO, LLC;
SUSIE'S TRACKSIDE LLC; LAST HURRAH LLC;
HOTEL PUB, L.L.P.; WOOD SHED, INC.;
GEORGE SIMONIS; Q GAME TECHNOLOGIES
PTY LTD; and NICK MCLEOD,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Big Daddy Games, LLC contends that defendants Reel Spin Studios, LLC,

Game Management Corp. and their respective owners and members, defendants James L.

Donker, David E. Grond, Patrick Young, William Stimac and Michael Lindeman, have

infringed plaintiff's copyrights on certain video slot machine games. In particular, plaintiff

contends that these defendants hired defendants Q Game Technologies and Nick McLeod

to create games substantially similar to plaintiff's games and then leased and installed video

1

EXHIBIT
F

game consoles containing those games in bars and restaurants in Wisconsin operated by defendants Rhody R. Millick, Dale Cebula, Kathleen Maloney, Matthew Barrett, Robert L. Diener, The Lyons Den DL, LLC, Gameday Sports Bar, Inc., Antlers Sports Bar & Grill, LLC, Oshkosh Lanes LLC, Back Again Stadium Bar, Inc., Mr. D's Two, LLC, Susie's Trackside LLC, Last Hurrah LLC, Hotel Pub, L.L.P., Nigl's, Inc. and Wood Shed, Inc.

Now before the court are the parties' cross motions for summary judgment. All defendants, with the exception of defendant Simonis, moved for summary judgment on plaintiff's copyright infringement claim, contending that plaintiff does not own valid copyrights on the games at issue and that even if it did, the copyrights are significantly limited. Dkt. #151. (All references to "defendants" throughout this opinion refer to all defendants with the exception of Simonis, who is representing himself in this litigation and has not joined any of the motions filed by the other defendants.) Additionally, defendants contend that plaintiff cannot show that defendants copied its source code and that even if it could, plaintiff cannot enforce any copyrights against defendants because defendants hold a valid license to the games and because plaintiff has used the copyrights to engage in illegal activity. Finally, defendants move for summary judgment on plaintiffs' claims against the individual defendants and on the issue of attorneys fees.

Defendant Simonis filed a separate motion for summary judgment, contending that he cannot be liable for copyright infringement because his business owns copyrights in the games at issue. Dkt. #163. For its part, plaintiff moves for summary judgment on defendants' license defense, as well as defendants' counterclaims for defamation and tortious interference with business relations. Dkt. #153. Also before the court are motions filed by

2

defendants to "strike" plaintiff's expert's report, dkt. #166, and to supplement their summary judgment materials. Dkt. #205.

After reviewing the parties' proposed findings of facts and arguments, I conclude that plaintiff owns a valid copyright in all versions of Egyptian Treasure, Spooky Spins and Reef Reels created before 2009 and that it is not precluded from enforcing these copyrights against defendants on the basis of its registration documents or the doctrine of unclean hands. Additionally, I conclude that no reasonable jury would find that defendant Simonis was a joint owner or author of the games who had the right to grant a license to defendants. Therefore, I am denying defendants' motion for summary judgment with respect to these issues and am denying defendant Simonis's motion in full. I am granting defendants' motion with respect to plaintiff's claim against defendant Young because plaintiff has adduced no evidence from which a jury could conclude that Young participated in the infringement so as to be held personally liable for it. I am also granting defendants' motion with respect to plaintiff's claim that defendants copied plaintiff's source code, because plaintiff has adduced no evidence to support that claim. Additionally, I am granting defendants' motion on the issue of attorney fees under the Copyright Act. Plaintiff cannot recover attorney fees under 17 U.S.C. § 412 because defendants' alleged infringement commenced before plaintiff registered its copyrights.

I am granting plaintiff's motion with respect to defendants' license defense, as well as defendants' defamation claim and counterclaim related to 8 Line Supply. I am denying the motion with respect to Reel Spin's counterclaim that plaintiff tortiously interfered with Reel Spin's prospective business relationship with Fun Company because there is a genuine

3

factual dispute regarding that issue.

With respect to the miscellaneous motions, I am denying defendants' motion to supplement their summary judgment materials because their proposed supplemental evidence would have no affect on the outcome of this decision. However, I am granting the motion to strike Steven Haenchen's expert report because plaintiff has not shown that his testimony would be helpful or appropriate.

The following statement of material and undisputed facts is drawn from the parties' proposed findings of facts. However, I note that many of the parties' proposed findings of fact are excluded, either because they were vague, conclusory, irrelevant, argumentative, consisted of legal conclusions or violated this court's summary judgment procedures. E.g. Dfts.' PFOF, dkt. #197,¶ 28 ("Simonis contributed all the ideas to Jones including directing the layout and theme for the games."); ¶ 121, ("Thus, plaintiff's copyrights, at most, are for derivative works of the original games."); ¶ 126 ("Plaintiff's liability expert (Mr. Haenchen) has not even tried to identify what is covered by the copyrights and has not even attempted to identify changes made from the 2005 versions—the subject of the copyrights—from the prior versions"); ¶ 163 ("If there is any copyright in the games Spooky Spins, Egyptian Treasure and Reef Reels, then George Simonis is half owner in such copyrights."). I note in particular that I excluded dozens of defendants' proposed findings of facts that consisted of paragraphs taken directly from their expert's report. Id. ¶¶ 172-214. These proposed facts were in clear violation of this court's rules, which require proposed facts to be "limited as nearly as possible to a single factual proposition." Procedure to be Followed on Motions for Summary Judgment I.B.1., dkt. #66, at 12. Moreover, many of the proposed "facts" were actually conclusory opinions provided by defendants' expert.

4

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Big Daddy Games is a Wisconsin limited liability company with its principal place of business in Wisconsin. Plaintiff sells and leases video amusement games to amusement device distributors, bars, game rooms and restaurants in Wisconsin, Texas, Ohio and elsewhere throughout the United States. Three of plaintiff's video games are at issue in this case: Egyptian Treasure, Reef Reels and Spooky Spins.

Defendant Reel Spin Studios is a Wisconsin limited liability company with its principal place of business in Wisconsin. Defendants Patrick Young, Michael Lindeman and William Stimac are members of Reel Spin. Reel Spin also possesses versions of Spooky Spins, Egyptian Treasure and Reef Reels that it sells to customers in Wisconsin, Texas and Illinois.

Defendant Game Management Corp. is a Wisconsin corporation with its principal place of business in Wisconsin. Defendant James Donker is an owner, vice president and secretary of Game Management. Defendant David Grond is an owner and president of Game Management. Defendants Rhody R. Millick, Dale Cebula, Kathleen Maloney, Matthew Barrett, Robert L. Diener, The Lyons Den DL, LLC, Gameday Sports Bar, Inc., Antlers Sports Bar & Grill, LLC, Oshkosh Lanes LLC, Back Again Stadium Bar, Inc., Mr. D's Two, LLC, Susie's Trackside LLC, Last Hurrah LLC, Hotel Pub, L.L.P., Nigl's, Inc. and Wood Shed, Inc. are bars or owners of bars operating in Wisconsin.

Defendant George Simonis is an Australian citizen. Defendant Q Game Technologies Pty Ltd is an Australian proprietary limited company. Defendant Nick McLeod is an

5

Australian citizen and the sole shareholder and director of Q Game.

## B. The Games

Between 2002 and 2004, John Paul Jones, an Australian citizen, created the Egyptian Treasure, Reef Reels and Spooky Spins video games. Jones began working on Egyptian Treasure first, in October 2002, as a game to be played on personal computers. He began selling a version of Egyptian Treasure on his website in January 2003.

On April 22, 2004, defendant Simonis contacted Jones through Jones' website, asking whether Jones would sell his "pokies" (an Australian word for slot machine games) on Simonis's website. This was the first contact between Jones and Simonis. Around the same time, in April 2004, Jones began working on Reef Reels, an ocean-themed game to be played on personal computers.

In July 2004, Jones started a new website, www.ultimateslotzone.com, and offered Reef Reels for sale for the first time. Also in July 2004, Jones created an account on www.regnow.com, an online software distribution and e-commerce service that connects software developers to sellers. The website enables software developers to register "affiliates" who are permitted to sell the developer's software, and typically, the software developer and affiliate share a portion of the profits from the sales. Jones uploaded Reef Reels and Egyptian Treasure to his RegNow account in July 2004 so that those games would be available for purchase online for use on a personal computer. On July 15, 2004, Jones added Simonis as an affiliate in his RegNow account and authorized Simonis to sell Reef Reels and Egyptian Treasure on Simonis's websites, www.ausieslots.com and pokies4fun.com. Jones

6

also agreed that Simonis could keep as commission 40% of the sale price for each sale of Reef Reels and Egyptian Treasure that he made through RegNow and 50% commission for sales made through Simonis's sites.

In August 2004, Jones updated the graphics in Reef Reels using graphics from www.animationfactory.com. Also in August 2004, Jones emailed Simonis a screen shot of Spooky Spins, which Jones was then developing, stating, "I thought you might be interested in seeing what the new game is going to look like . . . . At the moment I'm thinking of calling the game 'Spooky Spins.' If you have any name ideas let me know." Dkt. #155-12. Jones completed Spooky Spins in approximately November 2004 and permitted Simonis to sell Spooky Spins on his website, www.pokies4fun.com.

Jones created "custom builds" of Egyptian Treasure, Reef Reels and Spooky Spins for Simonis's websites. These "custom builds" included adding a link to www.aussieslots.com (and later www.pokies4fun.com) so that Simonis's customers could link directly to those websites, not Jones's websites. Dkt. #155-6. Jones also put a notice on the games stating, "Copyright © www.pokies4fun.com 2004," with an active link to the Pokies4fun website. (On the non-custom games, Jones had placed copyright notices but did not incorporate links to any website.)

In creating the three games, Jones came up with the themes and chose all the graphics that are used as symbols in the games on the basis of what he believed would best express the Egyptian, aquatic and spooky themes. Jones added background colors and borders to the graphics; designed the "royals" (representing the Ace, King, Queen, Jack 10 and 9), including applying "layer styles" and choosing the fonts and colors; determined the hierarchy of the

7

symbols; added animation to certain symbols; and assigned "payouts" to each symbol. With respect to Reef Reels and Spooky Spins, Jones added a "pick" bonus feature and chose and arranged the graphics used in the feature. Jones developed the computer source codes for the games.

The parties dispute whether Simonis was involved in the creation of the games. According to plaintiff, Jones created the games independently with little to no input from Simonis. Jones submitted a declaration averring as much. Jones Dec., dkt. #155. According to defendants, Simonis made contributions to the games. During his deposition, Simonis stated that he contributed to version 3.03 of the games by paying for graphics from www.animationfactory.com, giving Jones ideas about sounds and images, performing beta testing, providing customer support, sales and marketing and by asking Jones to embed credit card details in the game so that people could purchase the game by credit card. Simonis Dep., dkt. #146, at 72-76, 89. With respect to beta testing, Simonis stated that when he found errors in the games, he communicated those to Jones. Simonis could remember finding two errors in the games. (Other people, including customers and Jones's mother, performed beta testing as well.) Simonis admitted at his deposition that Jones created Egyptian Treasure before meeting Simonis, id. at 72; that Simonis did not choose the graphics for Reef Reels or Spooky Spins, id. at 81, 89; and that he could not remember any specific contributions he made to Reef Reels or Spooky Spins beyond general "ideas" for sounds, images and "layout." Id. at 85, 89. Simonis also admitted that version 3.03 of the games were likely created by August 2004, while he did not purchase any graphics from www.animationfactory.com before October 2004. Id.

8

Jones never attempted to obtain an official registered copyrights for the games. On the "portable application description files" for version 3.03 of the three games, which were available to customers on www.pokies4fun.com, Jones listed himself as the "author" of the games. These files allow software developers to provide standardized product descriptions and specifications, including authorship information, to online sources in a standardized way. Jones provided these files to Simonis and Simonis never objected to the fact that the files listed Jones as the author of the games.

### C. Jones's Transactions with Fat Man Games International

In August 2004, Todd Stimac emailed Jones, saying he was interested in "purchasing the source code for the slot games." Dkt. #152-27. At the time, Stimac was working for Fat Man Games International, LLC. Jones responded that if Stimac was "seriously interested in purchasing the source and Visual Basic, [he] could rewrite the games in that language for you." Id. In September 2004, Fat Man Games paid Jones $3,569.49 (AU) for rights to Egyptian Treasure. (The parties dispute the scope of what Jones sold Fat Man Games. Plaintiff says that Jones sold it all copyrights, trademark and intellectual property rights to all versions of the game, including version 3.03, with the exception of the right to sell the shareware version of Egyptian Treasure online for use on personal computers. In his most recent declaration, Jones confirms that this was the case. Dkt. #155 at ¶ 20. Defendants contend that Jones sold nothing more than the "source code" to the game, pointing out that the emails between the Jones and Stimac refer only to source code and say nothing about "copyrights" or intellectual property.)

9

In December 2004, Jones sold the rights to Spooky Spins and Reef Reels to Fat Man Games for $3,204.65 (AU). (Again, the parties dispute whether Jones sold only the source code or whether he sold copyrights to all aspects of the games. Plaintiff and Jones contend that Jones transferred all of his copyrights in the games to Fat Man Games, with the exception of Jones's right to continue selling the games for use on personal computers. Jones Dec., dkt. #155 at ¶ 40. Defendants contend that Jones sold only the right to use the source code for "offline" commercial use in video slot machines. Defendants point to testimony from Jones at a hearing held in this court in Toccata Gaming International, LLC v. Reel Spin Studios, LLC, 11-cv-600-bbc on September 13, 2011 (filed in this case at Dkt. #143). During that hearing, Jones testified that he sold his rights to the games in 2004 for Stimac to "use the game for offline purposes," dkt. #143 at 24, and that he retained rights in the shareware versions of the games. Id. at 46-47. Stimac also testified at the hearing that he purchased the rights for "offline use" of the games. Id. at 68.)

After Jones sold the games to Fat Man Games, he continued to do work on the games at the request of Todd Stimac. Dkt. #152-27. On March 10, 2006, Stimac and Eric Jacobson (also of Fat Man Games) emailed Jones to say that because Jones had been working for them, they needed to "firm up our business relationship," and in particular, "need to be sure that the code we purchased from you belongs to us." Dkt. #152-20 at 2. Jones responded that "I am completely under the understanding that the code you purchase[d] from me belongs to you, and I would be willing to agree to this in a written agreement." Id.

10

### D. Business Relationship Between Jones and Simonis

Simonis registered the name "Pokies4fun" as his own business name in February 2005. Until approximately July 2005, Simonis continued to receive a commission of 40% or 50% of the sale price for any sales of Jones's games that he made for use on personal computers. In July 2005, Simonis and Jones entered into a more formal business arrangement. There was no written partnership agreement, but Jones and Simonis agreed verbally that Simonis would receive 50% of all sales made through www.pokies4fun.com and through Jones's other affiliates who were selling games that Jones created and developed. For his part, Jones would receive 50% of the sales on www.pokies4fun.com and Simonis's other websites related to games that Jones did not create or develop, as well as 50% of the sales that Simonis made through his eBay store. Simonis and Jones registered Pokies4fun as a business under both their names in July 2005.

There was no written agreement between Simonis and Jones under which Jones assigned his copyrights to Simonis or Pokies4fun. Also, Jones never told Simonis that any of Jones's games or intellectual property rights would be owned jointly by the partnership and they never had any discussion about whether the games would be owned by the partnership. Simonis testified that although he never discussed the issue of copyrights with Jones, he just "took it for granted that both parties would own all assets and liabilities." Simonis Dep., dkt. #146 at 153-56.

At some point in 2006, the business relationship between Jones and Simonis soured. Near the end of July 2006, Jones emailed Simonis, saying, "Let me know if you would be interested in buying out my half of the business so that you have full resale rights of my

11

games and therefore all profits from the sales. . . ." Dkt. #155-20. In a followup email, Jones stated that he "would be willing to sell you all resale rights of all games for $15,000. Any profit you make from the sales of the games from this point onwards would be all yours." Id. Simonis rejected the offer. On July 30, Jones emailed Simonis again, stating that it was "unfortunate" that Simonis had rejected the offer because Jones needed the money to pay off his debts and develop games. Dkt. #152-20. He also stated that he was going to start finding "other ways of making money from [his] games" and that he was "going to start selling [his] games on ebay" himself. Id.

On August 10, 2006, Jones sent an email to Simonis, saying that he had been working on a new game engine and new games and that he was opening up a new site to sell his games. Dkt. #155-21. He asked Simonis whether he would be interested in selling the new games on his website and told him that the commission would be 30%. Simonis responded stating, "My con[c]ern at the moment is what [is] going to happen to the business. We need to rectify this before we can proceed any further as [I] don't know where [I] stand. If you can come to some arrangement please let me know, as [I] have to rethink everything." Id. Jones responded, "In regards to the business that me and you have I will need my name taken off the business . . . [I]f you wish to continue selling my games then you will need to go back to working on a commission basis. . . . As far as I'm concerned the aggrement [sic] was broken and our partnership is finished. I have handed the rights to my games over to my mother, you have handed over the ebay business to your son, and in regards to the websites then you can do whatever you want with them." Id. at 1. Jones wrote that his mother had registered a business to sell Jones's new games, as well as some of his older

12

games, and that if Simonis wanted to sell the games also he could do so as an affiliate of Jones's mother's business, with a 30% commission for any sales. Id. On August 28, 2006, Jones emailed Simonis to say that because Simonis had never purchased the resale rights to any of Jones's games, he had "no right to . . . continue to sell [his] games without [his] permission." Dkt. #155-22. Jones also stated that "[a]bout the only thing that you accomplished during the whole year was to download a web template and upload some screenshots, and you also burned a few cd's which most pirates are good at anyway. . . . You didn't use that time to learn any new skills that would of been beneficial to the business. . . ." Id.

In May 2008, counsel for Jones wrote to counsel for Simonis, demanding that Simonis cease and desist selling Jones's games on the ground that Jones owned the copyrights in them. Dkt. #152-73.

### E.  Simonis's License to Reel Spin Studios

In late 2009, William Stimac (Todd Stimac's brother) asked Simonis whether he would be willing to license Egyptian Treasure, Reef Reels and Spooky Spins to defendant Reel Spin Studios. On January 20, 2010, Simonis, acting as the "owner and director" of Pokies4fun, entered into a software license agreement with Reel Spin. Dkt. #156-2. The agreement purports to grant Reel Spin an exclusive license to use "gaming system software" to run the three games as individual applications . . . ." Id.

13

## F. Dissolution of Fat Man Games and the Intellectual Property Confirmations

Fat Man Games and its sole owner, Triax Enterprises LLC, dissolved on January 5, 2009 and its assets were distributed. Todd Stimac and Eric Jacobson each owned 50% of Triax and on the dissolution of Fat Man Games, they each received joint and equal ownership of all of Fat Man Games's rights, title and interest in and to the copyrights, trademarks and other intellectual property rights owned by Fat Man Games.

Sometime in 2011, Jacobson signed a "copyright and trademark assignment" purporting to assigning to plaintiff all of his rights, title and interest in Egyptian Treasure, Reef Reels and Spooky Spins. Dkt. #83-2. The document states that the assignment "shall be effective as of January 6, 2009." Id. Around the same time, Todd Stimac signed an Intellectual Property Confirmation, purporting to assign all of his rights in the games to Toccata Gaming International, LLC. Dkt. #83-3. Also in 2011, John Jones signed an "Intellectual Property Confirmation" in which he purported to confirm that he had "sold, assigned and transferred all copyright and other intellectual property rights to all versions of the Games created before 2009 to TOCCATA's predecessor in title (Fat Man Games International, LLC) together with the right to sue for past, present and future infringement of such versions," and that he had sold Toccata all rights to the games created after 2008. He also states that "[t]his includes, without limitation . . . the software (object codes and source codes), screen depictions, all other copyrightable aspects therein and thereto, and trademarks. . . ." Dkt. #83-1. Jones also states in the document that "he has not transferred to, or licensed, any other person or entity with respect to any copyright or trademark rights to the Games." Id.

14

## G. Registration of Copyrights in the Games

Plaintiff and Toccata registered copyrights in the three games in 2011. The registration for Egyptian Treasure excludes "artwork" and includes "text [and] compilation," dkt. #83-5; the registration for Spooky Spins is for "computer program [and] artwork," dkt. #83-4; and the registration for Reef Reels excludes "artwork" and includes "compilation [and] computer program." Dkt. #83-6. The registrations list John Jones as the author of the games and the first date of publication for the games as January 31, 2005.

In November 2011, Simonis filed a copyright registration for the three games on www.copyrightregistry.com.au, a privately-operated website not affiliated with any Australian government body. He listed both himself and Jones as authors. Dkt. #152-17.

## H. Reel Spin's Attempt to Sell the Games to Fun Company

Sometime in 2010, William Stimac and another employee of defendant Reel Spin arrived uninvited at the offices of Fun Company, a company that sells video amusement games to customers that operate the games or distribute them throughout Wisconsin and the United States. Stimac and the employee met with Don Teske and Dan Lewicki, salespeople for Fun Company, and left copies of Reel Spin's versions of Egyptian Treasure, Reef Reels and Spooky Spins at the offices.

After the meeting, Teske and Lewicki spoke with Jamie Woodward, the president of Fun Company, about the meeting. Woodward turned on the game boards but did not test the game himself. Woodward was interested in the product and would have liked to sell it, but he knew that plaintiff and Toccata also sold versions of the games. Woodward was

15

concerned about possible legal problems. Woodward Dep., dkt. #148 at 34-36. He left the games in the company's warehouse.

On October 5, 2011, Lewicki sent an email to Mike Lindeman of Reel Spin to say that Fun Company wanted to explore exclusive market territory in certain counties with respect to the games. Dkt. #156-8. (As Fun Company's president, Woodward would have made the final decision whether the company entered into an exclusive market territory with Reel Spin.) Around the same time, Lindeman had eight or nine phone conversations with employees from Fun Company about a potential deal. During some of the conversations, Lindeman discussed prices and volume for sales of the games with Fun Company.

On or around October 11, 2011, Fun Company received a letter from plaintiff's counsel, stating that Reel Spin did not possess the right to license or sell the three games to Fun Company or any other customer in the United States. After receiving the letter, Fun Company shipped the two games back to Lindeman.

## OPINION

### A. Defendants' Motion for Summary Judgment

A plaintiff alleging copyright infringement must establish two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991); see also Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 507 (7th Cir. 1994). Defendants challenge plaintiff's ability to establish either element. With respect to plaintiff's ownership of a valid copyright, defendants contend that (1) plaintiff cannot

16

establish a valid chain of title from the authors of Egyptian Treasure, Reef Reels and Spooky Spins to itself; (2) to the extent plaintiff owns any copyright in the three games, that copyright is limited to derivative works published in 2005 and (3) even if plaintiff can establish ownership, its copyrights are not valid because the works are not original. With respect to the second element of plaintiff's claim, defendants contend that plaintiff cannot show that defendants copied plaintiff's source code and that even if defendants had copied plaintiff's games, defendants were licensed to do so by George Simonis, the co-author of the games. Finally, defendants contend that because plaintiff's copyright is for gambling machines, plaintiff's entire claim is barred by the doctrine of unclean hands. Defendants also move for summary judgment on plaintiff's claims against individual defendants and on the issue of attorney fees.

I address each of defendants' arguments below. However, I note that defendants raised new arguments in their reply brief that I have not considered, including (1) plaintiff's copyright is invalid under 17 U.S.C. § 103(a) because its use of graphics from www.animationfactory.com was unlawful, Dfts.' Reply Br., dkt. #199, at 30-31; (2) plaintiff's expert Mr. Korver is not qualified to be an expert and his methodology is unreliable, id. at 14-16; and (3) plaintiff's copyright registrations do not comply with 17 U.S.C. § 409(9), id. at 19-25. By waiting to raise these issues for the first time in a reply brief, defendants waived them. Narducci v. Moore, 572 F.3d 313, 324 (7th Cir. 2009).

## 1. Defendants' license defense

I am addressing defendants' license defense first because the resolution of this issue

17

affects the remainder of the issues raised in defendants' motion. (Defendant Simonis and plaintiff also moved for summary judgment on this issue, so I am considering in this section all of the arguments raised in all of the parties' briefs on this issue.) The parties agree that although Australian law governs the ownership and authorship of the work at issue, Australian law is substantially similar to the copyright law of the United States. Plt.'s Br., dkt. #157, at 12; Dfts.' Resp. Br., dkt. #183, at 4. All parties have applied laws of the United States to their analysis and I will do the same.

Defendants contend that they cannot be liable for copyright infringement for copying or distributing Egyptian Treasure, Reef Reels and Spooky Spins, because defendant Reel Spin Studios had a valid license from Simonis to sell the games. Defendants rely specifically on the January 20, 2010 Software License Agreement between Reel Spin and Simonis, in his role as the "owner-director" of Pokies4fun, which purported to grant Reel Spin "an exclusive license to use the gaming system software. . . ." Plaintiff contends that defendants have no evidence showing that Simonis had any right to license the games and thus, Reel Spin's license is invalid and illusory.

In support of their contention that Simonis had the right to grant an exclusive license to the games, defendants say that Simonis was a joint owner of the copyrights and a joint author of the work. Under 17 U.S.C. § 201(a), "[t]he authors of a joint work are co-owners of copyright in the work." Thus, each author may use or license the joint work. Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1068 (7th Cir. 1994).

Defendants contend that three pieces of evidence support their contention that Simonis was a joint owner of the games: (1) Simonis's partnership with Jones in Pokies4fun;

18

(2) the copyright notices Jones placed on the games next to the link for www.pokies4fun.com; and (3) the copyright registration Simonis filed in Australia listing himself and Jones as joint owners. However, no reasonable jury could not find from this evidence that Simonis was a joint owner of the games.

Although Simonis and Jones had a business relationship, there is no evidence that Jones transferred or assigned, orally or in writing, any copyrights, trademarks or any other intellectual property rights in any version of the games to Simonis or their business, Pokies4fun. Simonis conceded that he never had a discussion about copyrights with Jones and that Jones never told Simonis that the business owned the copyrights. The fact that Jones placed a copyright notice next to the link to the Pokies4fun website is not proof that the copyright was owned by the business. Further, defendants cannot rely on the fact that *Simonis* decided to register the copyrights with a private website in Australia in 2011, several years after Jones's and Simonis's business relationship had ended.

Similarly, defendants have not adduced sufficient evidence from which a reasonable jury could conclude that the games were a "joint work" between Simonis and Jones. In the United States, the author of a work is the person who "actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989). A "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. To prove that a work is a joint work, the party asserting joint authorship must show (1) intent to create a joint work; and (2) contribution of independently copyrightable

19

material. Janky v. Lake County Convention & Visitors Bureau, 576 F.3d 356, 361 (7th Cir. 2009); Erickson, 13 F.3d at 1071.

With respect to the intent prong, the question is whether "the parties intended to be joint authors at the time the work was created." Erickson, 13 F.3d at 1071. For instance, if both parties were credited as co-authors at the time the work was published, that may be evidence of joint authorship. Id. at 1072. As to the second element, the party asserting joint authorship must show more than a "de minimis" contribution and one that its is independently copyrightable. Id. at 1070-71. Thus, in Erickson, the putative joint author of a play was not a joint author where his contributions were limited to "[i]deas, refinements, and suggestions," because "standing alone" these contributions were "not the subject of copyright." Id. at 1072. See also Gaiman v. McFarlane, 360 F.3d 644, 658 (7th Cir. 2004) (someone who merely suggests ideas or makes "helpful editorial changes" is not joint author). These requirements for proving joint authorship exist because "published creations are almost always collaborative efforts to some degree—peers make suggestions, editors tweak words, and so forth." Janky, 576 F.3d at 363. If courts were to "deem every person who had a hand in the process a co-author, 'copyright would explode.'" Id. (citing Gaiman, 360 F.3d at 658).

Defendants have adduced no evidence that Jones and Simonis intended to be joint authors or producers of a joint work at the time the games were created. Although Simonis now asserts that they intended to produce a joint work, that is irrelevant. Janky, 576 F.3d at 362 (statements of intention made years later are "irrelevant" because issue is whether parties "intended to be joint authors at the time the work was created"). Nothing in the

20

record suggests that either Jones or Simonis referred to Simonis as a creator of the game or that Jones ever gave credit to Simonis as a joint author. Rather, Jones repeatedly identified the games as "his," both in emails to Simonis and in the publicly available portable application description files associated with the games.

As to the second element, independent copyrightability, defendants have adduced no evidence that Simonis's contributions went beyond general "[i]deas, refinements, and suggestions." Although defendants contend that Simonis contributed to the creation of the games by (1) "direct[ing] [Jones] regarding various aspects of the Games, including the layout, sound and graphics"; (2) providing and paying for "many of the graphics used in the games"; and (3) "beta testing, updating, and modifying the games as needed," Dfts.' Resp. Br., dkt. #183, at 7-11, they have provided no specific evidence to support these assertions. They rely solely on Simonis's conclusory statements that he made those contributions, but Simonis himself could not identify any of his specific contributions to the games' layout, sounds and graphics. He answered repeatedly during his deposition that he could not remember his contributions or modifications to the games; he was unable to explain the discrepancies between the dates he allegedly purchased graphics from www.animationfactory.com and the likely completion dates of the games; he could identify no errors that he identified or corrected in the games; and he admitted ultimately that Jones made the final decisions regarding the selection of images, sounds and layout of the games.

In sum, although Simonis may have made minor suggestions, the central decisions regarding the games were Jones's. Defendants have adduced no evidence that any of Simonis's contributions were significant or independently copyrightable, to the extent they

21

even existed. At this stage of the case, Simonis's vague and conclusory assertions about his alleged contributions are insufficient to create a genuine dispute of material fact regarding authorship. Compare Janky, 576 F.3d at 363 (joint author contributed "concrete expressions" that were "important not only to the final sound, but also to [the] commercial viability" of the song), with Erickson, 13 F.3d at 1072 (actors were not joint authors because they "could not identify specific contributions that they had made to Ms. Erickson's works" and even if they could "the contributions . . . were not independently copyrightable"). Accordingly, no reasonable jury could find that Simonis was a joint owner or author of the games who had the right to grant a license to defendants. Therefore, I am denying defendants' motion for summary judgment on their license defense, denying defendant Simonis's motion as to his ownership of the games and granting plaintiff's motion on the issue of defendants' license defense.

## 2. Plaintiff's ownership of the copyrights

Plaintiff contends that it owns copyrights in all aspects of all versions of Egyptian Treasure, Spooky Spins and Reef Reels as a result of various oral or informal written assignments that were later confirmed by the Intellectual Property Confirmation Agreements signed by the relevant parties in 2011. According to plaintiff, Jones assigned all of his copyrights to all versions of the games created before 2009 to Fat Man Games in 2004. When Fat Man Games dissolved in 2009, the copyrights belonged to Jacobson and Stimac, who transferred their rights to plaintiff and Toccata Gaming International, respectively. These various transfers were confirmed by Intellectual Property Confirmation Agreements

22

signed by the relevant parties in 2011, and Jones and Jacobson submitted declarations in conjunction with plaintiff's summary judgment materials confirming this. Jones Dec., dkt. #155; Jacobson Aff., dkt. #159.   Plaintiff contends that this evidence is sufficient to establish its chain of title and comply with the requirements of 17 U.S.C. § 204(a), which requires that the transfer of copyright ownership be made in writing through an instrument of conveyance or a note or memorandum of transfer signed by the owner of the rights.

In their motion for summary judgment, defendants contend that plaintiff has not proven its ownership of the copyrights and that as a result, plaintiff has no right to claim ownership of copyrights in the games. Defendants' primary argument is that Jones had no intention of transferring "copyrights" to Fat Man Games in 2004; rather, he intended only to license Fat Man Games to use the games in offline video slot machines. Defendants contend that any subsequent evidence to the contrary, including Jones's recent declarations and the written Intellectual Property Confirmation Agreements, are shams created solely for the purposes of litigation and should be disregarded. In other words, the recent written agreements and declarations are attempts to memorialize transfers that never actually occurred. Defendants point to several facts in the record to support their argument, including: (1) 2004, 2005 and 2006 email negotiations about the games between Jones and Todd Stimac of Fat Man Games, in which both Jones and Stimac discussed only the transfer of source code and did not mention copyrights; (2) statements from Jones, Jacobson and Stimac during depositions and during the 2011 preliminary injunction hearing in this court to the effect that Fat Man Games had purchased rights to "offline use" of the games and that Jones had retained shareware rights; (3) statements from Jones and his mother to Simonis

23

after 2006 in which they held themselves out as owners of the copyrights in the games; (4) the lack of any mention of copyrights when Fat Man Games was dissolved; and (5) the Intellectual Property Confirmation Agreement was undated and created in 2011, shortly before plaintiff commenced this litigation.

Although I agree with defendants that the transfer of ownership in the copyrights at issue has been less than clear, I conclude that plaintiff has established ownership of the copyrights. On their face, the Intellectual Property Confirmation Agreements signed in 2011 satisfy the requirements for transfer of copyright ownership under § 204(a). Although § 204(a) requires that transfers be in writing, there is no requirement that the writing be signed before or at the time of the transfer of rights. The requirement may be satisfied by the copyright owner's later execution of a writing that confirms the agreement. Billy Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 591 (7th Cir. 2003) ("oral assignment may be confirmed later in writing"); Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 827 (3d Cir. 2011); Eden Toys, 697 F.2d at 36. See also Barefoot Architect, 632 F.3d at 827 (upholding written agreement transferring ownership nine years after creation of the works and four years after the lawsuit was filed). The Intellectual Property Confirmation Agreements are sufficient to evidence the transfer of Jones's rights in the three games to plaintiff via Fat Man Games, Stimac and Jacobson. Further, the declarations of Jones, Stimac and Jacobson submitted by plaintiff with its summary judgment materials confirm that Jones has no current ownership interest in the copyrights to the three games, with the exception of rights to sell the shareware versions, and that plaintiff owns the copyrights to all versions of the games created by Jones before 2009.

24

Defendants contend that there is no reliable evidence in the record of an agreement before 2011, but they have no standing to challenge the sufficiency of the written agreements or the statements by Jones, Stimac and Jacobson regarding their intentions and the transfer of copyrights to plaintiff. The reason copyright transfers must be in writing is to protect copyright holders and to resolve disputes between copyright owners and transferees about the status of the copyright. Billy Bob Teeth, 329 F.3d at 592. Where there is no such dispute, an accused third-party infringer cannot challenge the evidence of transfer in an effort to avoid suit. Id. (holding that accused infringer "did not have standing" to argue that "there was no reliable evidence of a prior agreement which could be memorialized" by later created document); Imperial Residential Design, Inc. v. Palms Development Group, Inc., 70 F.3d 96, 99 (11th Cir. 1995) (stating that it would be "unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement"); Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 36 (2d Cir. 1982) ("it would be anomalous to permit a third party infringer to invoke this [writing] provision against the licensee"); X-IT Products, L.L.C. v. Walter Kidde Portable Equipment, Inc., 155 F. Supp. 2d 577, 608 (E.D. Va. 2001) (same). The original author of the games, Jones, has not raised any dispute about the rights he conveyed to plaintiff or its predecessors, and, in fact, has confirmed his intention to transfer his rights through a valid, written Intellectual Property Confirmation Agreement. Defendants cannot avoid an infringement suit by challenging Jones's transfer of his rights.

25

### 3. Whether plaintiff can enforce only derivative works

Defendants contend that even if plaintiff owns copyrights in the three games, it owns and can enforce rights only to the derivative elements of the games that were added in 2005. Under the Copyright Act, a "copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). Thus, if plaintiff were limited to suing only on its derivative copyrights, it would be required to prove that defendants infringed original expression added in 2005 that is distinct from the original expression contained in earlier versions of the games created and published by Jones between 2002 and 2004. Plaintiff has not attempted to make such a showing and thus, defendants would be entitled to summary judgment on plaintiff's infringement claims.

Defendants make two arguments in support of their contention that plaintiff is limited to enforcing only the derivative rights. First, defendants argue that Jones transferred only derivative works to plaintiffs. This argument fails for the reasons explained above. Plaintiff owns copyrights in all versions of the games as a result of transfers and assignments from Jones, Fat Man Games and Jacobson.

Defendants' second argument is that even if plaintiff owns copyrights in all aspects of all versions of the games, plaintiff can bring an infringement claim to enforce only its copyright in "derivative" works first published in 2005 because those are the only copyrights that plaintiff registered. Under copyright law, copyright protection arises independently of registration, but a copyright holder may sue for infringement of that copyright only if it

26

possesses a valid copyright registration. 17 U.S.C. § 411(a); see also Reed Elsevier, Inc. v.
Muchnick, 559 U.S. 154 (2010) (holding that although registration is not jurisdictional, it
is prerequisite to filing suit).

In this case, plaintiff possesses copyright registrations for each of the three games.
Each registration identifies John Jones as the author and January 31, 2005 as the date of first
publication. The registration for Egyptian Treasure is for "text [and] compilation" and
excludes "artwork," dkt. #83-5; the registration for Spooky Spins is for "computer program
[and] artwork," dkt. #83-4; and the registration for Reef Reels is for "compilation [and]
computer program" and excludes "artwork." Dkt. #83-6.

I conclude that plaintiff is not limited to enforcing only its copyrights in derivative
works. The cases that defendants cite in their brief in support of summary judgment concern
situations in which the owner of the copyright in the derivative work is different from the
author or owner of the underlying work. For example, in Schrock v. Learning Curve
International, Inc., 586 F.3d 513, 515 (7th Cir. 2009), and Pickett v. Prince, 207 F.3d 402,
404 (7th Cir. 2000), the author and owner of the underlying works was not the author or
owner of the derivative works. In Schrock, the licensee of the copyrights in the Thomas &
Friends characters, hired the plaintiff, Schrock, to photograph the Thomas & Friends
characters. Schrock, 586 F.3d at 516-17. The licensor owned the copyrights in the original
works (the Thomas & Friends characters) and Schrock authored the derivative work (the
photographs of those characters). Because the owner of the original work and the author of
the derivative work were different, Schrock's copyrights in the photographs extended only
to the "incremental original expression" contributed by Schrock. Id. at 518. Similarly, in

27

Pickett, the author of the original work (Prince's symbol) and the author of the derivative work (a guitar shaped like that symbol) were different. Pickett, 207 F.3d at 403-04. Thus, to the extent the author of the derivative work had any copyrights in the guitar, such copyrights were "limited to the features that the derivative work add[ed] to the original." Id. at 405.

In this case, plaintiff owns the copyrights to both the derivative work and the underlying work, and all works were created by the same author. The concerns discussed in Schrock and Pickett are not present. Christopher Phelps & Associates, LLC v. Galloway, 492 F.3d 532, 538 (4th Cir. 2007) ("[W]hen the author of the derivative work *also* has a copyright on the underlying work, there is no need to protect the public domain or the author of the underlying work, as the entire work is that of the single author.") (emphasis in original).

Additionally, plaintiff is not limited to enforcing only the derivative aspects of the work simply because plaintiff listed the publication date as January 31, 2005 and did not register any earlier versions of the games separately. As explained in a leading treatise on copyright law, "when the same party owns the derivative or collective work plus the underlying elements incorporated therein, its registration of the former is sufficient to permit an infringement action on the underlying parts, whether they be new or preexisting." 2-7 Nimmer on Copyright § 7.16[B][5][c] (2012). This conclusion is supported both by the language of the copyright laws regarding statutory damages, 17 U.S.C. § 504(c)(1) ("all the parts of a compilation or derivative work constitute one work"), as well as numerous cases in which courts have concluded that registration of a derivative work is sufficient to permit

28

an owner to sue for infringement of the derivative and underlying works. In those cases, the courts reason that because an author obtains copyright protection as soon as it creates an original work, if the author incorporates the original work into the derivative or collected work, registration of the derivative or collective work is sufficient to allow the owner to enforce its copyrights on the entire work. E.g. Christopher Phelps, 492 F.3d at 539 ("While Phelps & Associates only registered the Bridgeford Residence design, that registration satisfied the prerequisite for suit under 17 U.S.C. § 411 for the *entire design*, even though some of it was created earlier in the form of the Bell and Brown Residence design.") (emphasis in original); Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 284 (4th Cir. 2003), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010) ("[B]ecause Imageline owned copyright in SuperBundle and Master Gallery and in the underlying works of each, its registration of SuperBundle and Master Gallery was sufficient to permit an infringement action on the underlying parts, whether they be new or preexisting"); Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 747 (2d Cir. 1998) ("[B]ecause Streetwise is the owner of the copyright of both the derivative and pre-existing work, the registration certificate relating to the derivative work in this circumstance will suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work."); Salestraq America, LLC v. Zyskowski, 635 F. Supp. 2d 1178, 1181 (D. Nev. 2009) (registration of 2008 version of factual compilation satisfied condition precedent for registrant's claim for infringing copyright on its 2007 version); In re Independent Services Organizations Antitrust Litigation, 964 F. Supp. 1469, 1473 (D. Kan. 1997) ("Xerox does not have to produce registrations of the preexisting works if it is the

29

Case 1:13-cv-01430-WCG   Filed 12/20/13   Page 49 of 71   Document 1-2

owner of those works . . . Xerox's registration of the derivative works is sufficient to allow an infringement claim based on copying of material, either newly added or contained in the underlying work."); Woods v. Universal City Studios, Inc., 920 F. Supp. 62, 64 (S.D.N.Y. 1996) ("[W]here the owner of the copyright for a collective work also owns the copyrights for its constituent parts, registration of the collective work satisfies the requirements of Section 411(a) for purposes of bringing an action for infringement of any of the constituent parts."); Greenwich Film Productions v. DRG Records, Inc., 833 F. Supp. 248, 251-52 (S.D.N.Y. 1993) (holding that registration for motion picture was sufficient to cover musical compositions contained therein where plaintiff owned copyrights in both).

In their reply brief, defendants contend that even if registration of a derivative work would be sufficient to permit enforcement of the underlying work in some circumstances, plaintiff cannot take advantage of this "effective registration" doctrine because plaintiff's registrations do not identify the 2005 games as derivative and do not include any reference to the earlier versions of the games upon which the 2005 versions were based. Defendants cite 17 U.S.C. § 409(9), which states that if a copyright application wishes to register a compilation or derivative work, it must identify in its application "any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." Defendants contend that these omissions from plaintiff's registrations preclude plaintiff from suing on its underlying copyrights. Defendants cite several cases in support of its argument. Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1229-30 (11th Cir. 2008); Rich & Rich Partnership v. Poetman Records USA, Inc., 714 F. Supp. 2d 657, 664 (E.D. Ky 2010); Oskar Systems,

30

LLC v. Club Speed, Inc., 745 F. Supp. 2d 1155, 1163-64 (C.D. Cal. 2010); I.M.S. Inquiry

Management Systems, Ltd. v. Berkshire Information Systems, Inc., 307 F. Supp. 2d 521,

527 (S.D.N.Y. 2004).

Defendants' argument fails for two reasons.  First, defendants raised this argument

for the first time in their reply brief.  Defendants made no mention of plaintiff's compliance

with § 409 in its opening brief, instead focusing on their arguments that Jones made only

a limited transfer of his copyrights and that plaintiff's copyright lists 2005 as the publication

date.  Defendants expanded their arguments about the plaintiff's registration significantly

in their reply brief, raising plaintiff's compliance with the statutory formalities of the

Copyright Act and § 409 for the first time.  Defendants forfeited these arguments by failing

to raise or develop them earlier.  Narducci, 572 F.3d at 324.

Moreover, I am not persuaded by defendants' arguments.  Several of the cases cited

by defendants can be distinguished from the present case on the basis of the underlying facts.

The court's discussion in Rich & Rich Partnership, 714 F. Supp. 2d at 664, is not applicable

because the plaintiff who was attempting to enforce a copyright in a derivative work in that

case was not the owner or author of the underlying work.  The plaintiff in Oskar Systems,

745 F. Supp. 2d at 1164, was attempting to "register and sue on a version of a software

program that was created *after* the version that defendants allegedly copied, by belatedly

characterizing the registered work as derivative. . . .," while the plaintiff in Oravec, 527 F.3d

at 1231, was attempting to rely on the registration of a derivative work that did not actually

incorporate the underlying work the plaintiff was attempting to enforce.  There is no dispute

in this case that the underlying and derivative works at issue were created and published

31

before defendants' alleged infringement and that the games registered by plaintiff are substantially similar (if not nearly identical to) the original games created by Jones.

Additionally, I am not persuaded by the reasoning of the courts in the cases cited by defendants to the extent those courts concluded that a plaintiff could not rely on the registration of a derivative work to enforce an underlying work solely because the registration did not identify the underlying work adequately. The courts in Christopher Phelps, Xoom and Streetwise and the other cases cited above did not base their conclusions on the fact that the copyright holder identified preexisting works in the registration. Rather, they concluded that so long as the same party owns both the derivative and preexisting work, there is no concern that party will be enforcing a copyright it does not own. Further, by registering a work that incorporates the party's preexisting copyrightable works, the party has essentially registered his "entire design." Accordingly, because plaintiff owns copyrights to all versions and aspects of the games at issue, its registrations of the 2005 versions of the games, which undisputedly incorporate the earlier versions, are sufficient to permit plaintiff to enforce its copyrights in all versions of the games published before 2005.

### 4. Originality, functionality and scènes à faire

Having concluded that plaintiff is the owner of and may enforce copyrights in Egyptian Treasure, Spooky Spins and Reef Reels, the next issue I must address is whether the games are "copyrightable." Generally, a plaintiff with a registered copyright receives a prima facie presumption of copyright validity. 17 U.S.C. § 410(c). However, a plaintiff is entitled to this presumption only if the work was registered within five years of first

32

publication, id., and plaintiff did not register the games within five years of first publication. Thus, plaintiff bears the burden of showing that there are elements of the games that are "original" and protectable by copyright. Wildlife Express Corp., 18 F.3d at 507.

Originality requires that the elements be created independently and possess at least some minimal degree of creativity. Nova Design Build, Inc. v. Grace Hotels, LLC, 652 F.3d 814, 818 (7th Cir. 2011). However, "the requisite level of creativity is extremely low; even a slight amount will suffice." Feist Publications, 499 U.S. at 345. In this circuit, copyrightability is an issue of law for the court. Schrock, 586 F.3d at 517 (citing Gaiman, 360 F.3d at 648-49).

Defendants make three arguments as to why the games are not copyrightable. First, the games are devoid of any originality because Jones merely copied clipart from the public domain and arranged the clipart into games that are nearly indistinguishable from other Egyptian, aquatic or spooky-themed games that existed in the public domain. Assessment Technologies of WI, LLC v. WIREdata, Inc., 350 F.3d 640, 643 (7th Cir. 2003) ("[W]hat is in the public domain cannot be appropriated by claiming copyright.").

One problem with this argument is that defendants failed to properly submit admissible evidence to support it. To be sure, defendants proposed dozens of facts relating to their argument that Jones's games are knock-offs of other slot machine-type games from the public domain, such as Aristocrat's Queen of the Nile and IGT's Cleopatra. However, defendants submitted these facts in the form of paragraph-long proposed findings drawn directly from their expert's report. Each proposed finding contained numerous factual propositions, conclusory statements and legal conclusions. As discussed above, I have

33

disregarded these facts for their failure to comply with this court's summary judgment procedures.

The other problem with their argument is that defendants fail to acknowledge that copyrights are available in "compilations and derivative works." 17 U.S.C. § 103. A "compilation" is a "work formed by the collection and assembling of preexisting materials or data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship," and a "derivative work" is "a work based upon one or more preexisting works." 17 U.S.C. § 101. As the court of appeals has explained, even if elements of a work are not capable of protection individually, "it is the unique combination of these common elements which form the copyrighted material." Roulo v. Russ Berrie & Co., 886 F.2d 931, 939 (7th Cir. 1989).

In creating his games, Jones chose images and modified or animated them on the basis of his opinion that the images and animations would be appealing to customers and would express Egyptian, aquatic and spooky themes. Jones had a large number of graphics to choose from that would have expressed the themes in the three games and a different author looking to create games with similar themes could have selected graphics different from those selected by Jones. Although the creativity that Jones used in the selection, compilation and arrangement of the graphics used in the three games may have been "extremely low," it was sufficient to meet the "slight" originality required under the copyright laws. Feist Publications, 499 U.S. at 345. See also Bucklew v. Hawkins, Ash, Baptie & Co., 329 F.3d 923, 929 (7th Cir. 2003) ("The fact that Bucklew's formatting choices do not reflect a high degree of originality is irrelevant. When as in this case a work in which copyright is claimed

34

is based on work in the public domain, the only 'originality' required for the new work to be copyrightable . . . is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors."). Moreover, the fact that Jones's games resemble games in the public domain with similar themes does not bar the games from copyright protection. Plaintiff is not claiming copyright in the "themes" or ideas of the games, but of the specific compilation and arrangement of graphics in the games. Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 614 (7th Cir. 1982) ("[I]t is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never the idea itself.") (citation omitted). None of the games identified by defendants contain precisely the same graphics or arrangement of graphics as the three games at issue. As the Supreme Court has explained, "[o]riginality does not signify novelty; a work may be original even though it closely resembles other works." Feist Publications, 499 U.S. at 345.

Defendants' second argument against copyrightability is that the graphics Jones selected to express the themes of the games are protectable only from "virtually identical copying" because they are "scènes à faire." Under the doctrine of scènes à faire, elements or themes that are "so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another," are protected only from virtually identical copying. Bucklew, 329 F.3d at 929; see also Incredible Technologies, Inc. v. Virtual Technologies, Inc., 400 F.3d 1007, 1015 (7th Cir. 2005) (golf courses, clubs, selection menu, golfer, wind meter and water features were scènes à faire to video golf game and therefore, not copyrightable); Atari, 672 F.2d at 616 (mazes, tunnels and scoring tables

35

in Atari's PAC-MAN video game were common to this class of video games and therefore scènes à faire and not copyrightable). Defendants contend that Jones's choice of graphics, colors and backgrounds for the games are not copyrightable because they are all "standard treatment" for the respective themes Jones was attempting to portray.

However, as discussed above, Jones had a wide array of graphics to choose from and the games' themes did not dictate the specific graphics or arrangement that Jones chose for either the regular playing screen or the bonus screens. In Atari, the court of appeals concluded that although some aspects of the game were scènes à faire, the figures used in PAC-MAN (the 'gobbler' and 'ghost monsters') were not scènes à faire because the game "d[id] not dictate the use of a 'gobbler' and 'ghost monsters.'" Atari, 672 F.2d at 617-18. As in Atari, neither the themes of Jones's games nor the fact that they are slot machine games, dictated Jones's selection of the specific graphics he used to express the games' themes. He could have created games with similar themes with entirely different graphics, as is apparent from the Egyptian, aquatic and spooky-themed games introduced by defendants as comparators. Moreover, even if the games consisted largely of scènes à faire and were protectable only from "virtually identical copying," it is clear that plaintiff's infringement claim is grounded on allegations that defendants engaged in "virtually identical copying" of plaintiff's games.

Finally, defendants argue that the arrangement of graphics and the particular buttons used in the games are not copyrightable because they are "functional" or "useful articles." Incredible Technologies, 400 F.3d at 1012 ("Useful articles and functional elements are also excluded from copyright protection."). Although there may be some features of plaintiff's

36

games that are "functional" or "useful articles," such as the spin function and the "help" and "collect" buttons, there are other features that are not dictated by functional considerations, such as the selection of the graphics and how they are arranged within the game. The existence of some functional elements or useful articles in the games does not render the games unprotectable.

## 5. Evidence of copying

Defendants moved for summary judgment on plaintiff's claim that defendants copied plaintiff's source code for the three games, contending that plaintiff has no evidence to support such a claim. Dfts.' Br., dkt. #162, at 12-185. Plaintiff does not respond to this argument in its brief in opposition, stating in a footnote that its "copyrights also cover the source code to the Games. As explained in this brief the infringement at issue here is Defendants' infringements of Big Daddy's copyrights to the selection, compilation, and arrangement of the graphics in the Games." Plt.'s Resp. Br., dkt. #185, at 22. It appears that plaintiff has abandoned its claim relating to defendants' infringement of the source code. Regardless, plaintiff's failure to respond to the argument means that issue is waived. Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Accordingly, defendants are entitled to summary judgment on this issue.

I note that neither party moved for summary judgment on the issue whether defendants copied any other copyrighted aspects of plaintiff's games, such as the selection and arrangement of the graphics and images. Therefore, this issue remains for trial.

37

6. Unclean hands

Defendants contend that even if plaintiff holds valid copyrights in the three games, the doctrine of "unclean hands" should bar plaintiff from recovering for injuries suffered in connection with gambling machines, which are prohibited under Wisconsin law. They contend that allowing plaintiff to seek relief would only encourage or reward plaintiff's illegal acts. In response, plaintiff denies that its games are "gambling machines" under Wisconsin law and contends that the games can be used as pure amusement devices.

I need not decide whether there is a genuine factual dispute regarding the legality of plaintiff's games or their status as gambling machines because defendants have cited no authority for the proposition that plaintiff should be barred from enforcing its copyright on the basis that plaintiff's copyright is in an illegal work or that plaintiff has used its copyright for an illegal purpose. Defendants rely primarily on a contract case decided in this district on a motion for summary judgment, Superior Vending, Inc. v. Dick's Bar, 2010 WL 4386663, *11 (W.D. Wis. Oct. 29, 2010), in which Magistrate Judge Stephen Crocker concluded that allowing the plaintiff to enforce a contract to lease video poker machines that made payouts to players would reward the plaintiff's illegal behavior and defeat the objectives of Wisconsin's anti-gambling statutes. However, in deciding that case, Judge Crocker relied on Wisconsin contract law, which prohibits enforcement of an illegal contract. Id. at *7 ("a contract is illegal and unenforceable where its formation or performance is forbidden by statute").

Defendants have identified no similar principle in copyright law. The Court of Appeals for the Seventh Circuit stated recently that it has not resolved the question whether

38

a plaintiff who holds a copyright on an "illegal work" should be permitted to enforce the copyright in an infringement suit. Flava Works, Inc. v. Gunter, 689 F.3d 754, 756 (7th Cir. 2012) ("[a] separate question, which is unresolved . . . is the applicability of the doctrine of *in pari delicto* (equally at fault) . . . to an infringement suit by the holder of a copyright on an illegal work"). However, the court of appeals did confirm in Flava Works that "illegality is not a bar to copyrightability." Id. This is because there is no evidence Congress intended content-based restrictions on copyrightability. 1 Nimmer on Copyright § 2.17; see also Mitchell Brothers Film Group v. Cinema Adult Theater, 604 F.2d 852, 855 (5th Cir. 1979) (purpose of copyright law "is best served by allowing all creative works (in a copyrightable format) to be accorded copyright protection regardless of subject matter or content"). For the same reason, "the fact that a copyrightable work is being used for illegal purposes should not constitute a defense to copyright infringement." Id. As is explained in Nimmer on Copyright, an unclean hands defense generally is permitted in a copyright case only if "the plaintiff's transgressions is of serious proportions and relates directly to the subject matter of the infringement action. For instance, the defense has been recognized when the plaintiff misused the process of the courts by falsifying a court order or evidence, or by misrepresenting the scope of his copyright to the court and opposing party." 4 Nimmer on Copyright § 13.09[B].

The Court of Appeals for the Ninth Circuit adopted the reasoning expressed in Nimmer on Copyright in Dream Games of Arizona, Inc. v. PC Onsite, 561 F.3d 983 (9th Cir. 2009). That case involved facts substantially similar to those in this case. In particular, the plaintiff accused the defendant of copyright infringement of an electronic video game,

39

which was illegal in the states in which plaintiff had been operating. Id. at 986. The defendant raised plaintiff's illegal conduct as a defense, but the court rejected it, concluding that "illegal operation of an otherwise copyrightable work does not deprive the work of copyright protection nor is it a defense to infringement . . . at least where the illegality does not injure the infringer." Id. at 991-92. The court also concluded that the plaintiff's alleged illegal actions did not preclude it from seeking statutory or actual damages. Id. at 992. Defendants cite no cases in which a court has reached a different conclusion.

Although there may be copyright cases in which an "unclean hands" defense should be recognized, defendants have not shown that this is such a case. As the court explained in Dream Games, there is no indication in the Copyright Act or other binding authority that Congress intended to limit a copyright holder's ability to enforce its copyrights on the basis of the holder's use of its otherwise legal copyrights, particularly in situations in which the holder's actions may be legal in some states and not in others. Further, this is not a case in which plaintiff's alleged illegal activity has been directed toward this litigation or has injured defendants. In fact, defendants have been engaging in the same allegedly illegal activity as plaintiff. Under the circumstances, plaintiff may enforce its copyrights against defendants. Therefore, I am denying defendants' motion for summary judgment on those grounds.

I note that although defendants may not rely on plaintiff's illegal activities as a defense to plaintiff's infringement claims, the question remains whether plaintiff's activities will be relevant to the damages it may recover. 4 Nimmer on Copyright § 14.04[C][3][b] (noting that although illegal activity is not complete defense to infringement claim, it may be relevant to computation of either statutory or actual damages). The parties did not

40

address this issue and I decline to resolve it without input from them. If the parties believe this issue could be relevant for trial, they should file motions in limine accordingly.

### 7. Claims against individual defendants

Defendants have moved for summary judgment on plaintiff's infringement claims against the individual defendants, contending that plaintiff cannot satisfy the "special showing" required to impose liability on individual officers of a corporate entity. Defendants rely on Dangler v. Imperial Machine Co., 11 F.2d 945, 947 (7th Cir. 1926) (holding that corporate officer can be held liable for patent infringement only if officer exceeds his duties and willfully and knowingly participates directly in infringing activity).

The only specific challenge defendants make is with respect to plaintiff's claim against defendant Patrick Young, member of defendant Reel Spin Studios. Defendants argue that plaintiff's only evidence of Young's involvement is his contribution of capital to Reel Spin and collection of profits from Reel Spin. I agree with defendants that Young cannot be held liable on the basis of this evidence alone. Young is essentially a silent partner who has little daily involvement in the company's business. There is no evidence suggesting that he participated in the alleged infringement in any way. Therefore, I will grant defendants' motion for summary judgment with respect to Young.

I am denying the motion with respect to all of the other individual defendants because defendants failed to develop any specific arguments about them. Plaintiff devoted approximately 13 pages of its brief in opposition to facts regarding the individual defendants, and defendants replied by asserting generally that plaintiff's attempt to hold the individual

41

defendants liable is "absurd" and "wrong." Dfts.' Reply Br., dkt. #199, at 36. By failing to develop this argument further, defendants have waived it. Although plaintiff's evidence may be insufficient with respect to certain individuals, I will not make defendants' arguments for them.

## 8. Attorney fees

Subject to certain exceptions, a court may not award attorney fees under the Copyright Act to a copyright owner unless the work in issue had been registered in the Copyright Office prior to commencement of the infringement.   17 U.S.C. § 412. Defendants seek a ruling that plaintiff cannot recover attorney fees because the effective registration dates of its copyrights are July 14, 2011 and March 21, 2012, while defendants' alleged infringement commenced in 2010.

Plaintiff concedes that defendant Reel Spin's alleged infringement commenced before plaintiff registered its copyrights and thus, it may not collect attorney fees or statutory damages from Reel Spin. Plt.'s Br., dkt. #185, at 63. However, plaintiff contends that it can obtain statutory damages or attorney fees from other defendants who obtained Reel Spin's games after plaintiff registered its copyrights. In particular, plaintiff contends that several defendants began operating the games after July 14, 2011 and thus, these defendants "commenced" infringement *after* the effective date of plaintiff's registrations.

Plaintiff's argument is not persuasive. "Commencement of infringement" means "the time when the first act of infringement in a series of ongoing discrete infringements occur. Thus, if the infringement on which suit is based commenced prior to registration, enhanced

42

damages are barred even if the infringement continues past the date of registration." 2 Nimmer on Copyright § 7.16[C][1][a][i] (citing Johnson v. Jones, 149 F.3d 494, 506 (6th Cir. 1998)). See also Bouchat v. Bon-Ton Department Stores, Inc., 506 F.3d 315, 331 (4th Cir. 2007) (holding that plaintiff could not recover fees under § 412 because initial infringement "commenced" before registration, even though initial infringer's licensees commenced infringing activities after registration). The limitations on attorney fees in § 412 apply "even if one of several defendants did not start to infringe until after registration." 2 Nimmer on Copyright § 7.16[C][1][c].   In contrast, the limitations do not apply if a "qualitatively new infringement occurs after registration," and particularly, if a "large lapse of time" occurs between the types of infringement. Id.

In this case, defendant Reel Spin Studios commenced the relevant infringement through its creation and sale of the allegedly infringing games in 2010.  The alleged infringement by other defendants through the display of Reel Spin's games is "related" and part of the same series of ongoing discrete infringements stemming from Reel Spin's first acts.  The alleged ongoing infringement is not "qualitatively different" and there was no large lapse of time.  Therefore, plaintiff may not recover attorney fees under § 412.  Defendants are entitled to summary judgment on this issue.

## B. Plaintiff's Motion for Summary Judgment

Defendant Reel Spin asserted three counterclaims against plaintiff related to the October 11, 2011 letter that plaintiff sent to various companies, including 8 Line Supply

and Fun Company, stating that Reel Spin "does not possess, and has never possessed, the right to license or sell the Games." In particular, Reel Spin asserts counterclaims for (1) defamation; (2) tortious interference with a business relationship with Fun Company; and (3) tortious interference with a business relationship with 8 Line Supply. Counterclaims ¶¶ 4-30, dkt. #91. Plaintiff moves for summary judgment on all three claims. (Reel Spin conceded in its opposition brief that its counterclaim for tortious interference related to 8 Line Supply lacks merit and should be dismissed. Dfts.' Resp. Br., dkt. #183, at 17, n.4. Therefore, I am granting plaintiff's motion for summary judgment with respect to that claim.)

### 1. Defamation

To prove a cause of action for defamation under Wisconsin law, a plaintiff must adduce evidence showing that an allegedly defamatory statement (1) was spoken to someone other than the person defamed, (2) is false, (3) is unprivileged and (4) tends to harm the defamed person's reputation so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Tongerson v. Journal/Sentinel, Inc., 210 Wis. 2d 524, 534, 563 N.W.2d 472, 477 (1997); Hart v. Bennet, 2003 WI App 231, ¶ 21, 267 Wis. 2d 919, 941, 672 N.W.2d 306, 317. Plaintiff contends that defendants' defamation claim fails for two reasons.

First, plaintiff contends that the statements it made in the October 2011 were true, because Reel Spin did not possess a valid license to the games. The problem with this argument is that although I agree that defendants did not have a license to plaintiff's games,

44

Case: 3:12-cv-00449-bbc   Document #: 238   Filed: 04/10/13   Page 45 of 51

the question remains whether Reel Spin was distributing games that infringed plaintiff's copyrights. Neither plaintiff nor defendants moved for summary judgment on the issue of copying (with the exception of the source code), so I cannot conclude that defendants had no right to distribute the games it was attempting to sell.

Plaintiff's second argument is that it was "conditionally privileged" to send the October 2001 letters under the Wisconsin doctrine of "common interest." The common interest privilege is based on the policy that one is entitled to learn from his associates what is being done in a matter in which he has an interest in common. Zinda v. Louisiana Pacific Corp., 149 Wis. 2d 913, 922, 440 N.W.2d 548, 552 (1989)). Whether a statement is protected by a conditional privilege is a question of law. Wildes v. Prime Manufacturing Corp., 160 Wis. 2d 443, 449, 465 N.W.2d 835, 838 (Ct. App. 1991). In the area of conditional privilege, Wisconsin has endorsed the language of the Restatement (Second) of Torts. Zinda, 149 Wis. 2d at 922. Section 596 of the Restatement defines the common interest privilege as follows:

> An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

Restatement (Second) of Torts § 596. In the sphere of common business and professional interests, the Restatement extends the privilege to "partners, fellow officers of a corporation for profit, fellow shareholders and fellow servants," as well as "[p]ersons associated together in professional activities." Id. at cmt. d.

Defendants contend that the privilege does not cover the letters sent by plaintiff to

45

Case 1:13-cv-01430-WCG   Filed 12/20/13   Page 65 of 71   Document 1-2

8 Line Supply and Fun Company because the privilege does not protect communications made by a seller (Reel Spin) to potential purchasers (8 Line Supply and Fun Company). Defendants cite Hy Cite Corp. v. Regal Ware, Inc., 2011 WL 1206768, *7 (W.D. Wis. Mar. 15, 2011), in which the court refused to dismiss a defamation claim at the pleading stage on the basis of the common interest privilege. In that case, Judge William Conley stated that sellers and purchasers "more likely than not have adverse and competing interests in pursuing their own business goals." Id. However, he did not conclude that the privilege never could apply to communications between sellers and purchasers. Rather, he concluded that it would be premature to dismiss a defamation claim at the pleading stage on the basis of the common interest privilege. Id. at *8.

I conclude that under the circumstance of this case, the common interest privilege applies to the communications among plaintiff, Fun Company and 8 Line Supply. Although these companies may have competing interests in some regards, their interests were aligned with respect to whether defendants had the right to sell the video games at issue. As potential game customers, Fun Company and 8 Line Supply had an interest in learning who possessed the right to sell or license the games so that the companies could avoid liability for purchasing, distributing or operating illegal works. Maggio v. Liztech Jewelry, 912 F. Supp. 216, 220-21 (E.D. La. 1996) (copyright holder's letters to third-party customers alleging that defendant infringed plaintiff's jewelry designs were conditionally privileged because third parties had interest in learning about plaintiff's concerns to avoid liability for selling infringing work).

Defendants contend that even if plaintiff may invoke the common interest privilege,

46

there is a genuine factual dispute regarding whether plaintiff abused the privilege. Zinda, 149 Wis. 2d at 924-25 (privilege is forfeited if abused). Specifically, defendants contend that plaintiff acted recklessly and in bad faith by sending the October 2011 letters after this court denied plaintiff's motion for a preliminary injunction on its copyright claims. I disagree. No reasonable jury could conclude that plaintiff acted in bad faith solely because this court denied plaintiff's motion for a preliminary injunction, particularly because the standard for granting a preliminary injunction is exceptionally demanding. The evidence in the record shows that plaintiff sent the letters after its obtained copyright registrations for the three games and after Jones signed the Intellectual Property Confirmation Agreement. Thus, there is no genuine factual dispute regarding whether plaintiff abused the common interest privilege. Accordingly, plaintiff is entitled to summary judgment on defendants' defamation claim.

## 2. Tortious interference with Reel Spin's prospective business relationship with Fun Company

Defendant Reel Spin contends that plaintiff's letter amounted to tortious interference with its prospective business relationship with Fun Company. To succeed on a claim for tortious interference, the plaintiff must prove the following elements: (1) a prospective contractual relationship; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant to disrupt the relationship; (4) actual disruption of the relationship causing damages; and (5) lack of privilege or justification for the defendant's interference. Burbank Grease Services, LLC v. Sokolowski, 2006 WI 103,

47

¶ 44, 294 Wis. 2d 274, 717 N.W.2d 781; Anderson v. Regents of the University of California, 203 Wis. 2d 469, 490, 554 N.W.2d 509 (Ct. App. 1996).

As with Reel Spin's defamation claim, its claim for tortious interference with its business relations will be moot if plaintiff is able to prove that the games Reel Spin was offering infringed plaintiff's copyrights. However, because that issue has not been resolved fully, I must address the parties' arguments regarding this claim.

Plaintiff does not argue that it was privileged to interfere with the prospective relationship between Reel Spin and Fun Company. Rather, it contends that Reel Spin cannot sustain its claim because Reel Spin's prospective relationship with Fun Company was not sufficiently "certain" or "concrete." In particular, plaintiff contends that Woodward, the president of Fun Company, had no plans to enter into a contractual agreement with Reel Spin and in fact, was skeptical about Reel Spin's legal right to sell or license the games.

I conclude that there are genuine factual disputes regarding whether Reel Spin had a "sufficiently concrete" prospective business relationship with Fun Company. Although Woodward had not decided whether to enter into an agreement with Reel Spin, Woodward's sales people were engaged in ongoing conversations and negotiations with Reel Spin about the terms of a prospective agreement and had expressed interest in acting as an exclusive dealer of Reel Spin's games. Taking the evidence in the light most favorable to Reel Spin, a jury could conclude that Reel Spin had a prospective relationship with Fun Company.

## C. Defendants' Motion to Strike Plaintiff's Expert Report

Defendants have moved to exclude the expert testimony of Steven Haenchen on the

48

grounds that he is not qualified and that his testimony is unreliable. Haenchen provided an expert report regarding the mathematical and visual similarity between defendants' Egyptian Treasure, Reef Reels and Spooky Spins games and plaintiff's games, dkt. #175-1, and a report in response to conclusions reached by defendants' expert Stacy Friedman. Dkt. #175-2. I note that it was not necessary to consider Haenchen's opinions to resolve the parties' summary judgment motions. However, I am resolving this issue so the parties know the court's position for purposes of trial.

After reviewing Haenchen's report, I conclude that it should be precluded, though not necessarily for the reasons offered by defendants. Rather, I conclude that Haenchen's report would not be useful to the jury in resolving the issues of copyright liability remaining in this case, namely, whether defendants infringed plaintiff's copyrights by copying Jones's arrangement and selection of graphics and images. This is not an issue that requires expert testimony.

Plaintiff must prove "copying" by "showing that the defendant had the opportunity to copy the original (often called 'access') and that the two works are 'substantially similar,' thus permitting an inference that the defendant actually did copy the original." Peters v. West, 692 F.3d 629, 633 (7th Cir. 2012). Whether two works are "substantially similar," depends on whether an "ordinary person" would conclude that the copying constituted an improper appropriation of the plaintiff's work. Incredible Technologies, 400 F.3d at 1011. Expert testimony is not relevant to the "ordinary observer" test, Atari, 672 F.2d at 614, which requires the jury to consider whether the accused work "captured the 'total concept

49

and feel' of the copyrighted work." Wildlife Express, 18 F.3d at 510-11. See also Allen v. Destiny's Child, 2009 WL 2178676, *7 (N.D. Ill. July 21, 2009) (ordinary observer test "does not involve analytic dissection and expert testimony"); Bryant v. Gordon, 483 F. Supp. 2d 605, 617 (N.D. Ill. 2007) (same) Thus, it is irrelevant whether Haenchen believes Reel Spin's games are similar visually to plaintiff's games. The question is whether an "ordinary observer" would conclude that the games are substantially similar. Accordingly, I am granting the motion to preclude Haenchen's testimony.

## ORDER

IT IS ORDERED that

1. Defendant George Simonis's motion for summary judgment, dkt. #163, is DENIED.

2. The motion for summary judgment filed by defendants Reel Spin Studios, LLC, Game Management Corp., James L. Donker, David E. Grond, Patrick Young, William Stimac, Michael Lindeman, Q Game Technologies, Nick McLeod, Rhody R. Millick, Dale Cebula, Kathleen Maloney, Matthew Barrett, Robert L. Diener, The Lyons Den DL, LLC, Gameday Sports Bar, Inc., Antlers Sports Bar & Grill, LLC, Oshkosh Lanes LLC, Back Again Stadium Bar, Inc., Mr. D's Two, LLC, Susie's Trackside LLC, Last Hurrah LLC, Hotel Pub, L.L.P., Nigl's, Inc. and Wood Shed, Inc., dkt. #151, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with the respect to plaintiff Big Daddy Games, LLC's claim that defendants infringed plaintiff's copyright on source code; plaintiff's claim against

50

defendant Young; and plaintiff's claim for attorney fees under 17 U.S.C. § 412. The motion is DENIED in all other respects.

3. Defendants' motion to supplement its summary judgment materials, dkt. #205, is DENIED.

4. Plaintiff Big Daddy Games, LLC's motion for summary judgment, dkt. #153, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to defendants' license defense; Reel Spin Studio's defamation counterclaim and Reel Spin Studio's counterclaim for tortious interference with a business relationship with 8 Line Supply. The motion is DENIED in all other respects.

5. Defendants' motion to exclude the expert report of Steven Haenchen, dkt. #166, is GRANTED.

Entered this 10th day of April, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge